749 N.W.2d 460 (2008)
275 Neb. 775
Sharon K. RANKIN, Appellant,
v.
W.K. STETSON, M.D., et al., Appellees.
No. S-07-073.
Supreme Court of Nebraska.
May 23, 2008.
*462 Maren Lynn Chaloupka and Robert Paul Chaloupka, of Chaloupka, Holyoke, Hofmeister, Snyder & Chaloupka, Scottsbluff, for appellant.
Lonnie R. Braun, of Thomas, Nooney, Braun, Solay & Bernard, L.L.P., Rapid City, SD, for appellees.
HEAVICAN, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.
WRIGHT, J.

NATURE OF CASE
Sharon K. Rankin sued her treating physicians and the Chadron Medical Clinic, P.C. (collectively defendants), for negligently failing to properly diagnose and treat her spinal cord injury. Following the completion of discovery, all defendants moved to strike the testimony of Rankin's expert witness and also moved for summary judgment on the issue of proximate causation. The district court sustained both motions. Rankin appeals, claiming the court erred in sustaining the defendants' motions.

SCOPE OF REVIEW
[1] In reviewing a summary judgment, an appellate court views the evidence in the light most favorable to the party against whom the judgment is granted and gives such party the benefit of all reasonable inferences deducible from the evidence. Wolski v. Wandel, 275 Neb. 266, 746 N.W.2d 143 (2008).
[2, 3] In proceedings where the Nebraska Evidence Rules apply, the admissibility of evidence is controlled by such rules; judicial discretion is involved only when the rules make such discretion a factor in determining admissibility. Karel v. Nebraska Health Sys., 274 Neb. 175, 738 N.W.2d 831 (2007). The admission of expert testimony is ordinarily within the trial *463 court's discretion, and its ruling will be upheld absent an abuse of discretion. In re Trust of Rosenberg, 273 Neb. 59, 727 N.W.2d 430 (2007).

FACTS
On October 31, 2002, Rankin was injured when she fell on ice near her residence in Chadron, Nebraska. She was examined in a Chadron hospital emergency room by Dr. W.K. Stetson. He ordered x rays and an MRI of the lumbar spine, which images showed no injury. Rankin was released from the hospital on November 3. She was directed to follow up with Dr. C.A. Sutera, her personal physician. She underwent physical therapy, but her symptoms persisted.
Sutera referred Rankin to Dr. Brent Peterson, a neurosurgeon. An MRI of her entire spine in February 2003 revealed a disk herniation at the T10-11 level with spinal stenosis. Peterson diagnosed Rankin with thoracic myelopathy, likely due to the ruptured disk at T10-11. He recommended a diskectomy and "fusion of T10-11 with autograft and rod and screw fixation." Peterson believed that the surgery was not an emergency at that point, since the compression had occurred a few months earlier.
During the following months, Rankin sought several opinions. Dr. Curtis Dickman, a neurosurgeon, saw Rankin on May 12, 2003. By that time, she had seen three other surgeons, who had all recommended surgery, but Dickman was the only surgeon who recommended thoracoscopic surgery rather than an open thoracotomy, which requires a large incision in the chest wall. Dickman operated on Rankin to fuse T10-11 of the spine.
Rankin recovered satisfactorily but was unchanged neurologically. By October 2003, the disk herniation was no longer evident and there was no residual compression of the spinal cord. However, Rankin continued to experience pain. Dickman recommended rigid fixation with screws and rods in her spine. Following the second surgery, Rankin was fitted with a brace to maintain alignment of the fused segments. By December, she was walking independently, although she reported using a walker intermittently.
On March 8, 2004, Dickman reported that the bone in Rankin's spine was fusing, and radiographs showed the formation of new bone. Rankin had persistent spasticity in her lower extremities, but she was walking without a walker. She had barely detectable weakness of the legs. Dickman recommended physical therapy to strengthen Rankin's back and abdominal muscles and to work on her endurance. He recommended she discontinue use of the brace, because the fusion had healed satisfactorily.
In October 2004, Dickman determined that Rankin was neurologically stable. She still had very mild weakness of the legs, spasticity, and local tenderness and pain at the site of the surgery. When Dickman saw Rankin on March 7, 2005, she had pain and spasticity, but there was no significant change. He again recommended physical therapy to help with her walking.
Rankin filed her complaint on October 28, 2004, alleging that the defendants' delay in diagnosing the damage to her spinal cord and their failure to repair it left her with permanent damage to her spinal cord and permanent impairment in her lower extremities. She alleged that the delay in diagnosis and the subsequent damage were proximately caused by the negligence of the defendants in failing to order "appropriate studies" in a timely manner. In separate answers, the defendants denied Rankin's allegations and asserted that *464 Rankin unreasonably delayed in following physician directions and may have caused some or all of her alleged damages.
Prior to trial, the defendants moved to exclude the testimony of Rankin's expert, Dr. Michael Brown, a neurosurgeon. Brown's affidavit contained a summary of his testimony to be offered at trial and the information upon which his opinions were based. Brown had been in private practice since 1985 and had completed a 5-year residency in neurosurgery at the University of Arkansas for Medical Sciences, where he received his medical degree. He was certified by the American Board of Neurological Surgery.
Based on reasonable medical probability, Brown stated that the neurological deficits Rankin currently suffered were permanent and were the result of her fall and the disk's contacting the spinal cord at the T10 level. Brown opined it was more likely than not that Rankin would have recovered if the surgical repair had occurred within the first 72 hours after her injury. He also believed that Rankin's chance of avoiding permanent injury decreased each day after the 72-hour period until she was finally diagnosed with the thoracic disk herniation with resultant spinal cord compression and thoracic myelopathy.
Brown had reviewed Rankin's medical records and her lumbar and thoracic MRI studies. His opinions were based on the training he received in medical school and his residency, his 20 years of experience in dealing with spinal cord injuries, information from discussions with colleagues and fellow neurosurgeons, and attendance at conferences.
Brown opined that the general standard for treating spinal cord injuries was to operate on the patient as soon as it could be accomplished if there was no significant reason which argued against surgery and that 72 hours was the general standard. The district court excluded Brown's testimony based on the principles of Schafersman v. Agland Coop, 262 Neb. 215, 631 N.W.2d 862 (2001).
The district court granted the defendants' subsequent summary judgment motion and dismissed the complaint. It concluded that Rankin had failed to produce competent expert testimony or evidence showing that any actions or inactions of the defendants proximately caused the injury complained of by Rankin.

ASSIGNMENTS OF ERROR
Rankin asserts that the district court erred in sustaining the defendants' motion to strike Brown's testimony and in sustaining the defendants' motion for summary judgment.

ANALYSIS

EXCLUSION OF BROWN'S TESTIMONY
[4] In refusing to allow Brown to give his opinion, the district court concluded that Brown failed to disclose the underlying facts or data for his opinions as required under Neb. Evid. R. 705, Neb.Rev. Stat. § 27-705 (Reissue 1995). It also held that Brown did not qualify to give his opinion under Neb. Evid. R. 702, Neb.Rev. Stat. § 27-702 (Reissue 1995), because he failed to set forth any methodology from which it could be determined that his opinions arose from facts or procedures that could be tested.
[5] In proceedings where the Nebraska Evidence Rules apply, the admissibility of evidence is controlled by such rules; judicial discretion is involved only when the rules make such discretion a factor in determining admissibility. Karel v. Nebraska Health Sys., 274 Neb. 175, 738 N.W.2d 831 (2007). The admission of expert testimony is ordinarily within the trial *465 court's discretion, and its ruling will be upheld absent an abuse of discretion. In re Trust of Rosenberg, 273 Neb. 59, 727 N.W.2d 430 (2007). Where the rules of evidence apply, the admissibility of an expert's testimony, including an opinion, which is based on a scientific principle or on a technique or process which utilizes or applies a scientific principle, depends on general acceptance of the principle, technique, or process in the relevant scientific community. Schafersman, supra.
Rule 702 states: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." We have held that pursuant to rule 705, "`"an expert's opinion is ordinarily admissible if the witness (1) qualifies as an expert, (2) has an opinion that will assist the trier of fact, (3) states his or her opinion, and (4) is prepared to disclose the basis of that opinion on cross-examination."'" City of Lincoln v. Realty Trust Group, 270 Neb. 587, 594, 705 N.W.2d 432, 439 (2005), quoting Heistand v. Heistand, 267 Neb. 300, 673 N.W.2d 541 (2004).
In Schafersman v. Agland Coop, 262 Neb. 215, 225, 631 N.W.2d 862, 872 (2001), we stated:
The Daubert standards require proof of the scientific validity of principles and methodology utilized by an expert in arriving at an opinion in order to establish the evidentiary relevance and reliability of that opinion. Under Daubert, supra, when faced with a proffer of expert scientific testimony, a trial judge must determine at the outset whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue. This entails a preliminary assessment whether the reasoning or methodology underlying the testimony is scientifically valid and whether that reasoning or methodology properly can be applied to the facts in issue. Daubert, supra.

The U.S. Supreme Court has set out a number of considerations that a trial court may use to evaluate the validity of scientific testimony, which include (1) whether the theory or technique can be, and has been, tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error, and the existence and maintenance of standards controlling the technique's operation; and (4) the "general acceptance" of the theory or technique. Schafersman, supra, citing Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).
In the case at bar, Brown was asked to give his opinion whether Rankin received the appropriate treatment at the hospital when she was admitted and during the 3 days until she was released. The subject of Brown's opinion was whether a patient with the type of injury sustained by Rankin should have had surgery within 72 hours of the injury. The district court, in applying the principles of Daubert/Schafersman, acted as a gatekeeper to ensure that the reasoning or methodology underlying the expert testimony was valid and properly applied to the facts in issue. Because Brown failed to disclose the underlying facts or data for his opinions under rule 705, Brown did not qualify to give his opinion under rule 702.
In his deposition, Brown was asked to define "more likely than not." He stated:
Well, that's what it says. I guess, you know, you could say 51/49. If, you know, 51 percent get better, then you *466 could say it's more likely than not. But based on my experience with these, and it's limited, you know, but in my knowledge, and I have read about these things, I have been educated on these things, go to meetings on these things, and I know about myelopathy; just based on my knowledge, the patient has a better opportunity to recover fully if they're operated more promptly, if it's recognized and dealt with.
Brown was asked for the basis of his opinion concerning the 72-hour timeframe. He stated: "I couldn't sit here and quote you ... specific articles at this point, no. I mean, there's some literature out there that talks about 24 hours or two weeks, you know. But as far as the 72-hour figure that I gave, no, I can't give you anything specific on that." When asked where the 72-hour standard came from, Brown said: "Well, that's a good question. Primarily, that's just based on what my opinion is on when they should be done after they're discovered." Brown said there is a controversy in his profession about the optimal timing: "I think people still wonder exactly what the right timing is." Brown said there is a big difference between early surgery and later surgery in acute disk herniations. Asked whether he agreed that most of the rapid changes in the spinal cord tissues occur within 8 hours or less, Brown said,
You know what? I really am not an expert on what's happening physiologically there. What I'm basing my opinions on are clinical outcomes. So I don't know in any given case how long it's going to take for you to get permanent changes in the spinal cord, you know, before surgery wouldn't help. I really don't know what that time frame is.
Brown was asked what happens after 72 hours, and he stated:
Well, in any given patient, again, I'm testifying as to what's more likely than not. And that 72-hour standard is one where I feel  and, again, this is partially based upon my training  not partially. It's based upon my training and experience. But what I'm saying is, if you operate before 72 hours, it's more likely than not they're going to make a full recovery. After that 72-hour period, then I think their chances diminish for them making a full neurological recovery.
Brown said he was not aware of any peer-reviewed literature that would support his opinion concerning the 72-hour period. Although he had no way to quantify how Rankin's deficits were increased or exacerbated by delaying surgery for more than 72 hours, Brown stated it would have been very unlikely for Rankin to make a complete recovery.
[6] The defendants objected to Brown's opinion, and the district court excluded his testimony. A trial judge may consider a number of factors that might bear on its gatekeeping function. These factors include whether a theory can be, and has been, tested; whether the theory has been subjected to peer review and publication; and whether the theory enjoys "general acceptance" within a relevant scientific community. See Schafersman v. Agland Coop, 262 Neb. 215, 631 N.W.2d 862 (2001). Brown was unable to state that his theory concerning the timeframe for spinal surgery had been tested in any way. He was also unable to provide a basis for his 72-hour theory. He could not cite any peer-reviewed literature to support his theory, and he did not provide any testimony to suggest that the 72-hour theory is generally accepted.
The admission of expert testimony is ordinarily within the trial court's discretion, and its ruling will be upheld absent *467 an abuse of discretion. In re Trust of Rosenberg, 273 Neb. 59, 727 N.W.2d 430 (2007). The district court rejected Brown's testimony based on the principles announced in Schafersman, supra. We conclude that the court's refusal to admit Brown's testimony into evidence was not an abuse of discretion.

SUMMARY JUDGMENT
[7, 8] Rankin claims that the district court erred in granting summary judgment in favor of the defendants. Summary judgment is proper when the pleadings and evidence admitted at the hearing disclose no genuine issue regarding any material fact or the ultimate inferences that may be drawn from those facts and that the moving party is entitled to judgment as a matter of law. Wolski v. Wandel, 275 Neb. 266, 746 N.W.2d 143 (2008). In reviewing a summary judgment, an appellate court views the evidence in the light most favorable to the party against whom the judgment is granted and gives such party the benefit of all reasonable inferences deducible from the evidence. Id.
In their motion for summary judgment, the defendants alleged that Rankin could not produce any competent evidence to prove that the defendants' alleged medical negligence proximately caused any injury to her. The district court found that Rankin had not produced competent expert testimony or evidence showing that any actions or inactions of the defendants proximately caused the injury of which Rankin complained.
[9, 10] The party moving for summary judgment has the burden to show that no genuine issue of material fact exists and must produce sufficient evidence to demonstrate it is entitled to judgment as a matter of law. Glad Tidings v. Nebraska Dist. Council, 273 Neb. 960, 734 N.W.2d 731 (2007). A movant for summary judgment makes a prima facie case by producing enough evidence to demonstrate that the movant is entitled to a judgment if the evidence were uncontroverted at trial. Then, the burden of producing evidence shifts to the party opposing the motion. Id.
In support of their motion for summary judgment on the issue of causation, the defendants offered published medical articles. One article stated that despite its widespread use in patients with acute spinal cord injury, the role of surgery in improving neurological recovery remained controversial. It opined that the role and timing of surgical decompression after an acute spinal cord injury remained one of the most controversial topics pertaining to spinal surgery. The other printed article dealt with a subgroup of patients with very large thoracic disk herniations. It stated there was scant literature on the treatment options and outcome of such patients.
There is some question whether the defendants' evidence made a prima facie case that entitled them to summary judgment. Medical literature which opines that the role of surgery in cases of acute spinal cord injuries remains controversial would not demonstrate that the defendants were entitled to judgment. It is true that Rankin must establish causation at trial, but the defendants must make a prima facie case at the summary judgment stage. Assuming for purposes of this opinion that such literature created a prima facie case in favor of the defendants, as the court must have so found, Rankin has successfully rebutted such evidence.
In opposition to the motion for summary judgment, Rankin offered several affidavits, including the affidavit of Dr. Jeffrey Gross, a neurosurgeon. Gross had reviewed Rankin's medical records, Dickman's *468 deposition, and certain evidence-based medical literature. Gross was asked to address whether early surgical decompression to relieve pressure on the spinal cord would have made it more likely than not that Rankin would have recovered with a lesser degree of neurological deficit. The defendants made no objection to the admission of Gross' affidavit.
From the materials he reviewed, Gross learned that immediately after the accident, Rankin suffered temporary total paralysis of her lower extremities, numbness, and loss of feeling. She had a "burning/tingling feeling" in her back and in the lower abdomen, especially on the left side. Gross noted that although Rankin had reported some improvement, the primary neurological deficits remained.
Gross stated that the longer a compressive spinal cord injury existed without remediation, the less likely the patient would regain lost neurological function. He stated that this principle was consistent with the findings of Rankin's treating doctors, all of whom agreed that her condition would not correct itself without surgery.
Gross further stated that medical literature supported his opinion that early surgical decompression of the spinal cord will more likely than not improve a patient's prognosis and would have led to an improved outcome for Rankin. He referred to certain articles in the medical literature that recommended surgical decompression at the earliest opportunity. He summarized one article which stated that if disk herniation is treated with early surgical decompression, the patient has a significantly increased opportunity to experience a "good outcome."
Gross was trained to understand that spinal cord compression constituted a surgical emergency, and he had applied that training to his own practice. His board-certified peers and colleagues agreed that spinal cord compression constituted a surgical emergency. Gross noted that the phrase "the sooner, the better," as applied to when a patient should undergo surgical decompression of a disk herniation, was not a "vague or cavalier statement." He stated that a reasonable neurosurgeon would agree that surgical decompression of a thoracic disk herniation causing spinal cord compression with neurological symptoms should occur within a matter of hours rather than weeks or months.
Gross based his opinion upon his training in medical school, his residency and spine fellowship, 14 years of experience in dealing with spinal cord injuries, discussions of the issue with fellow board-certified neurosurgeons, medical literature, and conferences where the subject had been discussed. He opined that the standard for treating such injuries was to operate within a matter of hours unless there were significant reasons which argued against surgery. Gross stated that evidence-based medicine, experimental data, and the practice of reasonable surgeons dictated that when a patient presented with an acute neurological change due to spinal cord compression, the appropriate treatment was acute surgical decompression.
Gross also stated it was more likely than not that Rankin would have had a better prognosis for neurological recovery if her thoracic disk herniation had been properly diagnosed and treated via surgical decompression by the morning after her accident, and he stated that her chance of avoiding permanent neurological injury decreased each day without surgery.
[11] On appeal, the defendants argue that Gross' opinions were framed in terms of "loss of chance" and were therefore insufficient to establish the defendants' alleged negligence as a proximate cause of *469 Rankin's injury. We agree that an opinion framed in terms of loss of chance would not sustain Rankin's burden of establishing that the defendants proximately caused her injury. We also note that Nebraska has not recognized the loss-of-chance doctrine. See Steineke v. Share Health Plan of Neb., 246 Neb. 374, 518 N.W.2d 904 (1994).
[12, 13] Gross' statements that Rankin would have had a "better prognosis" and a "chance of avoiding permanent neurological injury" do not equate with an opinion that it was more likely than not that Rankin would have had a better outcome if she had undergone surgery immediately following her injury. Opinions dealing with proximate causation are required to be given in terms that express a probability greater than 50 percent. Thus, Gross' statements do not establish the required certainty to prove causation. While a 49-percent chance of a better recovery may be medically significant, it does not meet the legal requirements for proof of causation. The terms "chance" and "prognosis" by definition do not establish the certainty of proof that is required.
On the other hand, an opinion expressed in terms that it is more likely than not that a plaintiff "would have had a better outcome" is sufficiently certain to establish causation. A better outcome is not the same as a chance of a better outcome. Rather, it is a definite result. In this case, there were statements within Gross' affidavit that were sufficient to establish causation.
When reviewing a summary judgment, we view Gross' affidavit in a light most favorable to Rankin and give her the benefit of all reasonable inferences from such evidence. Contrary to the defendants' assertion, Gross' affidavit espoused more than a mere "loss of chance." Gross opined that early surgical decompression of the spinal cord would more likely than not have led to an improved outcome for Rankin. This evidence established causation for the purpose of opposing the defendants' motion for summary judgment on such issue. Thus, Gross' affidavit satisfied the requirement that Rankin produce some expert testimony to establish that the actions or inactions of the defendants were a proximate cause of Rankin's injury.

CONCLUSION
[14] In a malpractice action involving professional negligence, the burden of proof is upon the plaintiff to demonstrate the generally recognized medical standard of care, that there was a deviation from that standard by the defendant, and that the deviation was the proximate cause of the plaintiff's alleged injuries. Karel v. Nebraska Health Sys., 274 Neb. 175, 738 N.W.2d 831 (2007). We view the evidence in the light most favorable to Rankin and give her the benefit of all reasonable inferences deducible from the evidence. See Neiman v. Tri R Angus, 274 Neb. 252, 739 N.W.2d 182 (2007).
The issue presented was whether Rankin had produced competent expert testimony showing that any actions or inactions of the defendants were a proximate cause of her injury. Gross' opinion that early surgical decompression would more likely than not have led to an improved outcome for Rankin was sufficient to establish an issue of fact concerning causation. Since there remains a material issue of fact in dispute, the district court erred in granting summary judgment. Therefore, we reverse the judgment of the district court and remand the cause for further proceedings.
REVERSED AND REMANDED FOR FURTHER PROCEEDINGS.