Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
09/29/2017 09:12 AM CDT

Mary Cohan and Terry Cohan, individually
and as wife and husband, appellants and
cross-appellees, v. Medical Imaging
Consultants, P.C., et al., appellees
and cross-appellants.

___ N.W.2d ___

Filed July 7, 2017.    No. S-16-145.

1. **Directed Verdict: Evidence: Appeal and Error.** A directed verdict is proper only when reasonable minds cannot differ and can draw but one conclusion from the evidence, that is, when an issue should be decided as a matter of law. In reviewing that determination, an appellate court gives the nonmoving party the benefit of every controverted fact and all reasonable inferences from the evidence.

2. **Physician and Patient: Negligence.** Nebraska does not recognize the loss-of-chance doctrine.

3. **Malpractice: Physician and Patient: Proof: Proximate Cause.** In a malpractice action involving professional negligence, the burden of proof is upon the plaintiff to demonstrate the generally recognized medical standard of care, that there was a deviation from that standard by the defendant, and that the deviation was a proximate cause of the plaintiff's alleged injuries.

4. **Malpractice: Physicians and Surgeons: Proximate Cause: Damages.** In the medical malpractice context, the element of proximate causation requires proof that the physician's deviation from the standard of care caused or contributed to the injury or damage to the plaintiff.

5. **Directed Verdict.** If there is any evidence which will sustain a finding for the party against whom a motion for directed verdict is made, the case may not be decided as a matter of law.

6. **Damages.** The amount of damages for pain, suffering, and emotional distress inherently eludes exact valuation.

7. ____. The amount of damages for pain, suffering and emotional distress is a matter left largely to the discretion of the fact finder, which saw the witnesses and heard the evidence.

8. **Trial: Evidence: Appeal and Error.** A trial court has the discretion to determine the relevancy and admissibility of evidence, and such determinations will not be disturbed on appeal unless they constitute an abuse of that discretion.

9. **Trial: Expert Witnesses: Appeal and Error.** A trial court's ruling in receiving or excluding an expert's testimony which is otherwise relevant will be reversed only when there has been an abuse of discretion.

Appeal from the District Court for Douglas County: JAMES T. GLEASON, Judge. Affirmed in part, and in part reversed and remanded for a new trial.

Richard J. Rensch and Sean P. Rensch, of Rensch & Rensch Law, P.C., L.L.O., for appellants.

David D. Ernst and Kellie Chesire Olson, of Pansing, Hogan, Ernst & Bachman, L.L.P., for appellees Medical Imaging Consultants, P.C., and Robert M. Faulk, M.D.

William R. Settles and Kate Geyer Johnson, of Lamson, Dugan & Murray, L.L.P., for appellees Bellevue Obstetrics and Gynecology Associates, P.C., et al.

HEAVICAN, C.J., WRIGHT, MILLER-LERMAN, CASSEL, STACY, and KELCH, JJ.

KELCH, J.

## I. INTRODUCTION

Mary Cohan and Terry Cohan brought a medical malpractice action against Medical Imaging Consultants, P.C.; Robert Faulk, M.D.; Bellevue Obstetrics and Gynecology Associates, P.C.; Michael Woods, M.D.; and Michelle Berlin, a physician's assistant (collectively Appellees). They alleged that Appellees' negligent treatment caused Mary's breast cancer to progress undiagnosed for 1 year and that her delayed

treatment caused physical and mental suffering, a shortened life expectancy, loss of consortium for Terry, and an increased risk of recurrence, entitling the Cohans to damages. After the Cohans presented their case in chief to a jury, the district court for Douglas County granted Appellees' motion for a directed verdict and dismissed the Cohans' complaint with prejudice. The Cohans now appeal and ask us to adopt the loss-of-chance doctrine. Appellees cross-appeal, alleging that the district court erred in allowing certain expert testimony. We decline to adopt the loss-of-chance doctrine. However, we conclude that, as to Mary's cause of action, the Cohans have met their burden under the traditional medical malpractice standard. We therefore affirm in part and in part reverse, and remand for a new trial, wherein the district court may address the evidentiary issues raised on cross-appeal, in light of this opinion.

## II. BACKGROUND

In accordance with our standard of review, the following facts give the nonmoving party the benefit of every controverted fact and all reasonable inferences from the evidence.[1]

On August 8, 2008, Mary underwent a diagnostic examination at a hospital in Papillion, Nebraska, after reporting that she felt some small lumps in her left breast. The diagnostic examination, which consisted of a mammogram with additional imaging and ultrasound, showed no abnormalities.

The following year, on October 12, 2009, Mary attended her annual physical examination with Berlin, a physician's assistant for Dr. Woods at Bellevue Obstetrics and Gynecology Associates. Mary told Berlin that Mary had lumps in her left breast and that she was concerned about the appearance of her left nipple. Shortly after this appointment, on October 21, Mary underwent a screening mammogram with Medical

---

[1] See *Scheele v. Rains*, 292 Neb. 974, 874 N.W.2d 867 (2016).

Imaging Consultants. Dr. Faulk read the mammogram as normal, with no evidence of malignancy.

A year later, in October 2010, Mary's annual mammogram identified an abnormality in her left breast. Further testing revealed a cancerous tumor. As a result, Mary underwent chemotherapy and radiation; a double mastectomy, during which surgeons also removed axillary lymph nodes; and reconstructive surgery. Upon removal, the cancerous tumor measured 7.1 centimeters in diameter. Examination of the lymph nodes showed that the tumor had metastasized, or spread, to 19 of the 24 lymph nodes removed.

On December 4, 2015, the Cohans filed an amended complaint against Appellees. They alleged that Appellees were negligent in failing to detect abnormalities in Mary's examinations in 2009 that would have led to the discovery of cancer prior to the discovery in 2010. They further alleged that Mary was prevented from being afforded a better outcome because of the yearlong delay in diagnosing the cancer and that she further sustained damages from a shortened life expectancy and physical and mental suffering. The Cohans incorporated the same allegations into Terry's cause of action and averred that Terry has and will sustain damages due to a loss of consortium.

Mary testified about the emotional trauma, anxiety, agony, and distress she experienced when she received the cancer diagnosis and had to decide whether to undergo surgical removal of one or both breasts. For a time, she took Xanax, an antianxiety medication, to help her cope. Mary testified that she also had mental pain and anguish as a result of the yearlong delay in diagnosis, and we set forth a portion of that testimony in the analysis section below. Mary further testified that 5 years after her diagnosis, she talked to her surgeon about the relative risk of recurrence and that that conversation caused her more anxiety than she had already been suffering. As of the time of trial, Mary had not experienced a recurrence of cancer.

Mary testified about the pain, fatigue, and other negative experiences incident to her surgery, chemotherapy, and radiation treatments. She stated that at the time of trial, she still had pain from the mastectomy. Mary described herself as "disfigured" after the reconstructive surgery "turned out horrible" due to the effects of radiation treatments. At the time of trial, she had "huge scars" and no nipples, her breasts were "lopsided" and "ugly," and one breast was as "hard as a rock." At the time of trial, Mary was taking medication to prevent cancer from recurring. She testified that this was stressful for her and that the medication weakened her bones. Mary also testified that she wore a compression sleeve on her left arm all day due to a condition called lymphedema, which, she stated, developed as a result of removing "quite a few lymph nodes."

Terry testified that he and Mary were married on September 4, 1982. He stated that he had been with her throughout her cancer diagnosis, treatment, and surgery. Terry described the entire experience as "quite traumatic" for them both, particularly following the diagnosis, when they were both "very upset, confused, [and] distraught." At the time of trial, Mary's emotional reaction to the cancer was not as intense as it was initially, but Mary still expressed concerns to Terry "[a]ll the time." Terry confirmed that Mary had used Xanax to help her cope but that she was not using it at the time of trial.

In addition to Terry's testimony, the Cohans presented deposition testimony of three expert witnesses. Dr. Catherine Appleton, a diagnostic radiologist with a subspecialty in breast imaging, opined that the 2009 mammogram showed an abnormality in Mary's left breast, which Dr. Appleton believed to be a cancerous tumor. In Dr. Appleton's opinion, to comply with the standard of care, Dr. Faulk should have taken further action to diagnose Mary's cancer following Mary's 2009 appointment and mammogram. She testified that had Mary undergone diagnostic imaging of her breast in 2009, more likely than not, the breast cancer would have been found. According to Dr. Appleton, the tumor grew in the interim

between the 2009 mammogram and the ultimate cancer diagnosis in 2010.

Dr. Appleton's testimony indirectly addressed the issue of breast conservation. Without prior evidence of Dr. Appleton's opinion about Mary's eligibility for breast-conserving surgery, the following colloquy occurred:

> Q. And while you may have the opinion that [Mary] might have been eligible to have breast conserving surgery if her cancer had been diagnosed in 2009, that decision is actually up to the patient, isn't it, whether to have a lumpectomy or a mastectomy or some other form of treatment?
>
> A. Well, to the extent that a surgeon can offer breast conservation therapy, there is a discussion between the surgeon and the patient. Some patients will not be offered breast conservation therapy. But on the other side of the coin, some patients who could get a lumpectomy choose to have a mastectomy. So it can go one way, but there are times when a patient just simply will not be offered breast conservation due to the extent of [the] disease. So it's not simply up to the patient.
>
> . . . .
>
> Q. Even if [Mary] was diagnosed with breast cancer in 2009 or even in 2008, and even she was — even if it would have been a stage 2 cancer at that time and she might have been eligible for a lumpectomy operation if she wanted to choose that option, she still was going to have to have some sort of operation on her breast, true?
>
> A. Yes. That would be convention, yes.

A 2010 MRI report received into evidence stated that the condition of Mary's left breast "would likely contraindicate nipple sparing procedures."

The Cohans presented the deposition testimony of Dr. Paul Gatewood, an obstetrician-gynecologist, who stated that Berlin had deviated from the standard of care in 2009. When asked whether he an opinion about what Mary's outcome would

have been had Berlin acted within the standard of care, Dr. Gatewood testified that the cancer would have been discovered in 2009. He observed that early diagnosis is the key to survival of any cancer, particularly breast cancer. He explained that the natural progression of a tumor is to grow until it is treated. Dr. Gatewood opined that had Mary's cancer been discovered a year earlier, the tumor likely would have been smaller and the lymph node involvement less extensive.

The Cohans also presented the deposition testimony of oncologist Dr. Michael Naughton, who explained the progression of the cancer and the risk of recurrence. Before Dr. Naughton's trial deposition testimony was presented to the jury, the district court overruled Appellees' motions to strike portions pertaining to risk of recurrence and loss-of-chance damages. The district court reasoned that the testimony was allowed by *Rankin v. Stetson*,[2] as "evidence that early intervention would more likely than not have led to an improved outcome."

Dr. Naughton estimated that in 2009, Mary's cancer likely involved a 3.5 centimeter tumor and up to 3 lymph nodes, in contrast with the 7.1 centimeter tumor and 19 cancerous lymph nodes discovered in 2010. He testified that Mary's tumor was moderately aggressive and that a tumor generally becomes more aggressive rather than less aggressive over time. Further, he testified that a tumor often develops the ability to spread at some point in its life cycle. Dr. Naughton stated that the smaller the cancerous tumor and the fewer lymph nodes involved at the time of diagnosis, the better the prognosis for the patient; whereas, the larger the tumor and the more lymph nodes infiltrated, the greater the risk of recurrence. He affirmed that risk of recurrence generally meant cancer manifesting itself distantly, past the nodes.

Dr. Naughton testified that the risk of recurrence "essentially starts at day zero from diagnosis and is continuous at a

---

[2] *Rankin v. Stetson*, 275 Neb. 775, 749 N.W.2d 460 (2008).

relatively stable level for the first ten years from diagnosis." He further explained that "roughly half the estimated recurrences happen in the first five years" and that the risk of recurrence is reduced when there has been no recurrence during the first five years following diagnosis. However, according to medical records, Mary's surgeon advised her that "we see more recurrences of hormone driven cancers in the second five years rather than the first."

Dr. Naughton testified that the risk of recurrence was based on population data and could not be extrapolated to an individual level and that he could not predict whether a specific person would fall into the group that experiences a recurrence. According to Dr. Naughton, risk of recurrence data is used to counsel individual patients about risk and to "classify women in a risk group so we can do clinical trials so we can study how different risk groups behave and respond to therapy."

Based on population data, Dr. Naughton testified that considering the type of cancer discovered in 2010, Mary's 10-year risk of recurrence "distantly is at least 75 percent." Dr. Naughton acknowledged that Mary's medical records as recently as 2014 showed no recurrence of cancer since her initial diagnosis in 2010 and that it was his understanding that Mary had experienced no recurrence. He testified that, consequently, her prognosis as to her rate of recurrence was better at the time of his 2015 deposition than it was when she was first diagnosed 5 years earlier, in 2010. He estimated that because Mary had "lived through approximately half of her risk," her 10-year recurrence risk moving forward from the time of trial was "as low as 35 percent."

Dr. Naughton also testified that had Mary's cancer been discovered in October 2009, her 10-year risk of recurrence would have been approximately 30 percent. He estimated that because Mary had lived through 6 years, or 60 percent, of that 10-year period, her residual risk of recurrence at the time of trial was 12 percent.

At the close of the Cohans' case in chief, Appellees moved for a directed verdict on the basis that the Cohans failed to make a prima facie case of causation and damages against them. The district court granted the motion and stated:

> As far as the directed verdict on causation and damages are concerned . . . I'm satisfied that there is sufficient evidence of negligence that that issue would go before the jury.
>
> I'm further satisfied that there is no probative evidence of damage [to Terry]. There's no testimony with regard to [Terry's] claim.
>
> And with regard to [Mary's] claim, I am satisfied that there is no sufficient proof of damage or causation other than the loss of chance of a . . . lower rate of non-recurrence. And under the law of Nebraska at the present time that does not constitute a proper measure of damage.
>
> For that reason I must sustain the motions for directed verdict filed by [Appellees] in this matter.

The Cohans now appeal this ruling.

Appellees cross-appeal, challenging the district court's ruling on their motions to strike testimony by Dr. Naughton.

## III. ASSIGNMENTS OF ERROR

On direct appeal, the Cohans assign that the district court erred in (1) granting Appellees' motions for directed verdict on the issues of proximate cause and damages and (2) dismissing the Cohans' first amended complaint on the basis that Mary failed to offer sufficient proof of damages or causation other than a "'loss of chance of a lower rate of non-recurrence.'"

On cross-appeal, Appellees essentially assign that the district court erred in denying their motions to strike Dr. Naughton's testimony.

## IV. STANDARD OF REVIEW

[1] A directed verdict is proper only when reasonable minds cannot differ and can draw but one conclusion from the evidence, that is, when an issue should be decided as a matter of law. In reviewing that determination, we give the nonmoving party the benefit of every controverted fact and all reasonable inferences from the evidence.[3]

## V. ANALYSIS

### 1. Mary's Claim

The Cohans approach this appeal from two different perspectives. They claim that they have met the traditional burden of proof for a medical malpractice claim but that if not, we should adopt the loss-of-chance doctrine and/or the Restatement (Second) of Torts.[4]

First, they point to their experts' opinions that Appellees were negligent in not locating the tumor in 2009 and that such negligence increased Mary's risk of distant metastatic recurrence, which was 30 percent if the tumor had been discovered in 2009, but rose to 75 percent by the time the tumor was discovered 1 year later. Based upon this testimony, the Cohans argue that the district court should not have granted a directed verdict, thus precluding consideration by a jury, because sufficient prima facie evidence had been presented showing (1) that there was a deviation from the standard of care by Appellees and (2) that the deviation was a proximate cause of Mary's injuries. However, the Cohans' arguments in regard to Mary's chances of survival are valid only if Nebraska adopts the loss-of-chance doctrine, a doctrine which, as discussed in more detail below, we have not adopted to date.

### (a) Loss-of-Chance Doctrine

The loss-of-chance doctrine is based upon the Restatement (Second) of Torts, which provides:

---

[3] *Scheele v. Rains, supra* note 1.

[4] See Restatement (Second) of Torts § 323 (1965).

One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if

(a) his failure to exercise such care increases the risk of such harm, or

(b) the harm is suffered because of the other's reliance upon the undertaking.[5]

One of the early discussions in regard to the loss-of-chance doctrine was a 1981 law journal article,[6] which reasoned:

Causation refers to the cause and effect relationship that must be established between tortious conduct and a loss before liability for that loss may be imposed. Causation questions relate to the fact of a loss or of its source. Valuation is the process of identifying and measuring the loss that was caused by the tortious conduct. . . .

. . . .

[The courts'] failure to distinguish between the functions of causation and valuation, or to identify and value rationally the true interests lost, has created a serious gap in the remedial structure. Courts have had difficulty perceiving that a chance of avoiding some adverse result or of achieving some favorable result is a compensable interest in its own right. In some respects the notion of chance has been subsumed into the final result. When this occurs, the loss of a chance of avoiding some adverse result or achieving some favorable result either is completely redressed or is denied, depending on the likelihood, destroyed by the defendant's tortious conduct, of avoiding or achieving the particular result.

---

[5] *Id.* at 135.

[6] Joseph H. King, Jr., *Causation, Valuation, and Chance in Personal Injury Torts Involving Preexisting Conditions and Future Consequences*, 90 Yale L.J. 1353, 1353-54 (1981).

> . . . [T]he loss of a chance of achieving a favorable outcome or of avoiding an adverse consequence should be compensable and should be valued appropriately, rather than treated as an all-or-nothing proposition.

Courts have taken this loss-of-chance discussion and applied it to medical malpractice actions by requiring a plaintiff to prove by a preponderance of the evidence that the medical provider's negligence caused the plaintiff's injury, where the injury consists of the diminished likelihood of achieving a more favorable medical outcome.[7] However, they have adopted different permutations of the loss-of-chance doctrine.

> One version, commonly termed the "relaxed causation" approach, simply loosens the traditional standard of evidentiary sufficiency, permitting the causation issue to be resolved by the fact finder even though there is no evidence of a reasonable probability that the defendant's negligence caused the patient's death or other ultimate harm. . . .
>
> Under the relaxed causation approach, the patient's ultimate death or injury, and not the lost chance itself, continues to be treated as the relevant harm when determining proximate cause. Hence, even while the lost chance may be less than even, full damages are awarded in the same manner as if the plaintiff had established causation under traditional principles. . . .
>
> . . . .
> . . . Other states, typically relying on the Second Restatement of Torts § 323(a), allow the case to be submitted based on evidence that the defendant's negligence increased the risk of the ultimate harm. . . .
>
> . . . .
> . . . Under this approach, damages are limited solely to the value of the lost chance.[8]

---

[7] See, e.g., *Matsuyama v. Birnbaum*, 452 Mass. 1, 890 N.E.2d 819 (2008).

[8] *Kramer v. Lewisville Memorial Hosp.*, 858 S.W.2d 397, 401-02 (Tex. 1993) (citations omitted).

The Cohans note that several states have adopted some version of the loss-of-chance doctrine.[9] In particular, the Cohans cite to *Matsuyama v. Birnbaum*,[10] a Massachusetts case which involved the death of the patient. There, the court held:

> "[I]njury" need not mean a patient's death. Although there are few certainties in medicine or in life, progress in medical science now makes it possible, at least with regard to certain medical conditions, to estimate a patient's probability of survival to a reasonable degree of medical certainty. . . That probability of survival is part of the patient's condition. When a physician's negligence diminishes or destroys a patient's chance of survival, the patient has suffered real injury. The patient has lost something of great value: a chance to survive, to be cured, or otherwise to achieve a more favorable medical outcome.[11]

---

[9] See, *Thompson v. Sun City Community Hosp., Inc.*, 141 Ariz. 597, 688 P.2d 605 (1984); *Ferrell v. Rosenbaum*, 691 A.2d 641 (D.C. 1997); *Holton v. Memorial Hosp.*, 176 Ill. 2d 95, 679 N.E.2d 1202, 223 Ill. Dec. 429 (1997); *Cahoon v. Cummings*, 734 N.E.2d 535 (Ind. 2000); *DeBurkarte v. Louvar*, 393 N.W.2d 131 (Iowa 1986); *Delaney v. Cade*, 255 Kan. 199, 873 P.2d 175 (1994); *Hastings v. Baton Rouge Gen. Hos*p., 498 So. 2d 713 (La. 1986); *Wollen v. DePaul Health Center*, 828 S.W.2d 681 (Mo. 1992); *Aasheim v. Humberger*, 215 Mont. 127, 695 P.2d 824 (1985); *Perez v. Las Vegas Medical Center*, 107 Nev. 1, 805 P.2d 589 (1991); *Evers v. Dollinger*, 95 N.J. 399, 471 A.2d 405 (1984); *Alberts v. Schultz*, 126 N.M. 807, 975 P.2d 1279 (1999); *Roberts v. Permanente Med. Group*, 76 Ohio St. 3d 483, 668 N.E.2d 480 (1996); *McKellips v. Saint Francis Hosp., Inc.*, 741 P.2d 467 (Okla. 1987); *Hamil v. Bashline*, 481 Pa. 256, 392 A.2d 1280 (1978); *Jorgenson v. Vener*, 616 N.W.2d 366 (S.D. 2000) (abrogated by statute as stated in *Smith v. Bubak*, 643 F.3d 1137 (8th Cir. 2011)); *Brown v. Koulizakis*, 229 Va. 524, 331 S.E.2d 440 (1985); *Herskovits v. Group Health*, 99 Wash. 2d 609, 664 P.2d 474 (1983); *Thornton v. CAMC, Etc.*, 172 W. Va. 360, 305 S.E.2d 316 (1983); *Ehlinger v. Sipes*, 155 Wis. 2d 1, 454 N.W.2d 754 (1990); *McMackin v. JCHC*, 88 P.3d 491 (Wyo. 2004).

[10] *Matsuyama v. Birnbaum, supra* note 7.

[11] *Id.* at 16, 890 N.E.2d at 832 (citations omitted).

In countering these arguments, the Texas Supreme Court in *Kramer v. Lewisville Memorial Hosp.*[12] noted that the real harm in any case is whether the patient ultimately suffers a recurrence or death. The court in *Kramer* went on to state:

> Unless courts are going to compensate patients who "beat the odds" and make full recovery, the lost chance cannot be proven unless and until the ultimate harm occurs. . . . Hence, legal responsibility under the loss of chance doctrine is in reality assigned based on the mere *possibility* that a tortfeasor's negligence was a cause of the ultimate harm.[13]

Although we find this reasoning persuasive, we acknowledge that the loss-of-chance doctrine has a level of attractiveness in protecting patients who are struggling with a serious medical situation, but, as we discuss later, the doctrine also comes with inherent drawbacks.

Were we to apply the loss-of-chance doctrine in the instant case, with Mary not having a recurrence as of the time of trial, the damages would represent the "mere possibility" that the tort-feasors' negligence caused ultimate harm, a harm which may never occur. Even a court which adopted a version of the loss-of-chance doctrine recognized that some versions of that doctrine allow "a jury to speculate on causation because expert testimony that a physician's negligence *probably* caused the total damages is not required."[14] Here, the jury would be left to speculate on possible harm in the future, since there was no evidence of Mary's chance of survival even if the cancer returned. The Cohans' expert only opined regarding the chance of recurrence, which, at the time of trial, was 30 percent.

In addition, although we are sympathetic to the Cohans' situation, adoption of the loss-of-chance doctrine in this case

---

[12] *Kramer v. Lewisville Memorial Hosp., supra* note 8.

[13] *Id.* at 405 (citation omitted) (emphasis in original).

[14] *DeBurkarte v. Louvar, supra* note 9, 393 N.W.2d at 137 (emphasis in original).

would create unwarranted liability in other cases and other medical contexts. It would, for example, reduce the standard of causation to a mere possibility rather than a preponderance of the evidence and allow for lawsuits in which the patient involved had only a slight chance of survival even prior to the medical professional's negligent conduct. Although no profession should avoid the consequences of negligent conduct, we choose not to lower the well-established standard of causation.

Lastly, as noted by the court in *Kramer*, how does an appellate court avoid the application of the loss-of-chance doctrine in other areas of the law, beyond medical malpractice? For example, does an unsuccessful litigant have a cause of action where an attorney's failure to object to evidence which negligently reduced the chance of success by some degree? After reviewing the several arguments for and against, we decline to adopt either the loss-of-chance doctrine or § 323 of the Restatement (Second) of Torts.

[2] Finally, the Cohans argue that this court has already adopted the loss-of-chance doctrine in Nebraska. They point to *Steineke v. Share Health Plan of Neb.*,[15] where the dissenting opinion argued that in *Washington v. American Community Stores Corp.*,[16] this court had "wittingly or unwittingly, wisely or unwisely, . . . recognized loss of chance as an element of tort damages." But the dissent also stated, "Perhaps the majority opinion has, knowingly or otherwise, silently overruled *Washington*."[17] Although past dissenting justices have expressed a desire to consider the loss-of-chance doctrine, we do not find this language controlling, especially, in view

---

[15] *Steineke v. Share Health Plan of Neb.*, 246 Neb. 374, 381, 518 N.W.2d 904, 909 (1994) (Caporale, J., dissenting; Lanphier, J., joins).

[16] *Washington v. American Community Stores Corp.*, 196 Neb. 624, 244 N.W.2d 286 (1976).

[17] *Steineke v. Share Health Plan of Neb., supra* note 15, 246 Neb. at 381, 518 N.W.2d at 909 (Caporale, J., dissenting; Lanphier, J., joins).

of the more recent case of *Rankin v. Stetson*,[18] where we specifically stated, "We agree that an opinion framed in terms of loss of chance would not sustain [the plaintiff's] burden of establishing that the defendants proximately caused her injury. We also note that Nebraska has not recognized the loss-of-chance doctrine."

To further support their contention that we have already adopted the loss-of-chance doctrine, the Cohans point to our previous approval of NJI2d Civ. 4.09, suggesting that "'[i]f you cannot separate damages caused by the pre-existing conditions from those caused by the accident, then the defendant is liable for all of those damages.'"[19] In *David v. DeLeon*,[20] we stated:

> "'In an action for damages for personal injuries caused by a wrongful act or omission, the injured person is entitled to recover full compensation for all damage proximately resulting from the defendant's act, even though his injuries may have been aggravated by reason of his pre-existing physical or mental condition, rendered more difficult to cure by reason of his state of health, or more serious, because of a latent disease, than they would have been had he been in robust health. . . .'"

However, we also stated, "We find that this instruction was the correct statement of the law and that it did not misstate the burden of proof: the instruction does not permit a jury to assess damages in any amount unless *the plaintiff first proves proximate cause*."[21] Our statement in *David* is consistent with the principle that the Cohans had the initial burden to prove causation of damages before a jury could proceed to apportioning damages.

---

[18] *Rankin v. Stetson, supra* note 2, 275 Neb. at 787, 749 N.W.2d at 469.

[19] See *David v. DeLeon*, 250 Neb. 109, 113, 547 N.W.2d 726, 729 (1996). See, also, NJI2d 4.09, comment.

[20] *David v. DeLeon, supra* note 19, 250 Neb. at 114, 547 N.W.2d at 729, quoting 22 Am. Jur. 2d *Damages* § 122 (1965).

[21] *Id.* at 114, 547 N.W.2d at 730 (emphasis supplied).

Furthermore, we note that in some instances, the application of the loss-of-chance doctrine, with its relaxed burden of proof, could prove contradictory to the Nebraska Hospital-Medical Liability Act, under which the claimant may recover damages only for those losses that are the direct and proximate result of the defendant's wrongful actions, as established by a preponderance of the evidence.[22]

After considering the Cohans' arguments, we conclude that this court has not adopted the loss-of-chance doctrine, and we shall not adopt it at this time.

### (b) Present Standard for Medical Malpractice Action

Next, the Cohans argue that the district court should not have granted a directed verdict, because they presented sufficient prima facie evidence showing causation and damages under our present standard for a medical malpractice action.

[3,4] Currently, in Nebraska, in a malpractice action involving professional negligence, the burden of proof is upon the plaintiff to demonstrate the generally recognized medical standard of care, that there was a deviation from that standard by the defendant, and that the deviation was a proximate cause of the plaintiff's alleged injuries.[23] In the medical malpractice context, the element of proximate causation requires proof that the physician's deviation from the standard of care caused or contributed to the injury or damage to the plaintiff.[24] The Cohans contend they have met these standards through their evidence and that as result, the jury, as trier of the facts, should resolve conflicts in the evidence and determine the weight and credibility to be given to the testimony of witnesses.[25] However, the jury here was forestalled from deliberating on

---

[22] See Neb. Rev. Stat. § 44-2819 (Reissue 2010).

[23] *Hamilton v. Bares*, 267 Neb. 816, 678 N.W.2d 74 (2004).

[24] *Thone v. Regional West Med. Ctr.*, 275 Neb. 238, 745 N.W.2d 898 (2008).

[25] See *Jones v. Meyer*, 256 Neb. 947, 594 N.W.2d 610 (1999).

the evidence by the directed verdict, the propriety of which we now consider on appeal.

[5] A directed verdict is proper only when reasonable minds cannot differ and can draw but one conclusion from the evidence, that is, when an issue should be decided as a matter of law. In reviewing that determination, we give the nonmoving party the benefit of every controverted fact and all reasonable inferences from the evidence.[26] If there is any evidence which will sustain a finding for the party against whom the motion is made, the case may not be decided as a matter of law.[27] But at the same time, we do not allow juries to engage in speculation or conjecture in determining damages.[28]

The question becomes whether, giving Mary the benefit of every controverted fact and all reasonable inferences from the evidence, there was any evidence upon which the jury could have based a finding in her favor. Here, the reasonable inferences from the evidence reflect that Appellees were negligent in not diagnosing Mary's cancer in 2009; that, as a result, the tumor grew from approximately 3.5 centimeters in 2009 to 7.1 centimeters in 2010; that the number of lymph nodes affected increased from approximately 3 to 19; that the 2010 MRI report stated that the condition of Mary's left breast "would likely contraindicate nipple sparing procedures"; and that Mary experienced anxiety following her diagnosis. Lastly, Mary further testified regarding pain and suffering as follows:

> Q. . . . Well, have you felt — have you felt bad, any mental pain or anguish as a result of what you feel happened to you as a result of having a delay in the diagnosis of your cancer?
>
> . . . .

---

[26] *Scheele v. Rains, supra* note 1.

[27] See *McWhirt v. Heavey*, 250 Neb. 536, 550 N.W.2d 327 (1996).

[28] See *Shipler v. General Motors Corp.*, 271 Neb. 194, 710 N.W.2d 807 (2006).

[Mary]: Yes, I feel a lot of anxiety about that. A lot. Because the reality is it wasn't caught in an early stage. It was an advanced stage. And I suffer from extreme anxiety and stress and depression from not knowing if I'm going to live. I don't know if I'm going to make it. Time will tell. But I don't know.

[6,7] By this testimony, Mary stated that she had incurred mental pain or anguish as a result of the delayed cancer diagnosis. Whether Mary's damages for anxiety were directly related to the delay in diagnosis or a consequence of discovering the cancer would have been a question of fact for the jury to determine. Although no specific dollar amounts were attached to her emotional injuries, the amount of damages for pain, suffering, and emotional distress inherently eludes exact valuation.[29] It is a matter left largely to the discretion of the fact finder, which saw the witnesses and heard the evidence.[30] Considering the jury's role as the fact finder and the evidence as a whole, we conclude that the Cohans presented evidence that could have sustained a finding for Mary on the issue of damages. Thus, the district court erred in granting Appellees' motions for directed verdict.

## 2. TERRY'S CLAIM

Terry claims the district court also erred in granting a directed verdict on his claim. However, although Terry confirmed the evidence presented by Mary, he failed to present sufficient evidence supporting his own cause of action. Therefore, the district court did not err in granting a directed verdict on his claim.

## 3. CROSS-APPEALS BY APPELLEES

Appellees' cross-appeals assign as error the admission of Dr. Naughton's testimony. Appellees moved to strike Dr. Naughton's testimony because they claimed that only Mary's

---

[29] *Roth v. Wiese*, 271 Neb. 750, 716 N.W.2d 419 (2006).

[30] *Fickle v. State*, 273 Neb. 990, 735 N.W.2d 754 (2007).

prognosis at the time of trial was relevant and that Nebraska did not recognize a theory of recovery based upon loss of chance. The district court, in overruling the motions to strike, found that Dr. Naughton's opinion was relevant for the limited purpose of establishing that early discovery of cancer leads to a better prognosis.

[8,9] A trial court has the discretion to determine the relevancy and admissibility of evidence, and such determinations will not be disturbed on appeal unless they constitute an abuse of that discretion.[31] A trial court's ruling in receiving or excluding an expert's testimony which is otherwise relevant will be reversed only when there has been an abuse of discretion.[32]

Appellees first argue that the district court should not have allowed testimony concerning damages which was based upon a life expectancy or likelihood of recurrence but did not reflect Mary's condition at the time of trial. This argument stems from Dr. Naughton's testimony that Mary's risk of recurrence had fallen to 30 percent at the time of trial. Basically, Appellees request that damages be limited to Mary's condition at the time of trial. We decline to adopt this theory.

In Nebraska, proven damages which are proximately caused by a breach of duty are recoverable. We have said that "'[i]n an action for damages for personal injuries caused by a wrongful act or omission, the injured person is entitled to recover full compensation for all damage proximately resulting from the defendant's act . . . .'"[33] And we have also found the term "personal injury" to be broad in scope.[34]

Accordingly, the district court did not err in refusing to limit Dr. Naughton's testimony to Mary's condition solely at the time of trial. Of course, a party can present evidence

---

[31] *Gallner v. Larson*, 291 Neb. 205, 865 N.W.2d 95 (2015).

[32] *Schafersman v. Agland Coop*, 262 Neb. 215, 631 N.W.2d 862 (2001).

[33] *McCall v. Weeks*, 183 Neb. 743, 750, 164 N.W.2d 206, 210 (1969).

[34] See *Gallion v. O'Connor*, 242 Neb. 259, 494 N.W.2d 532 (1993).

reflecting an injured party's current condition for any relevant purpose such as to mitigate damages. But the amount of damages, proximately caused, is an issue for the trier of fact to assess and weigh.[35]

Next, Appellees argue that Dr. Naughton's testimony should have been excluded because it pertained only to the loss-of-chance doctrine. We have determined that Nebraska does not recognize the loss-of-chance doctrine. Therefore, any evidence offered solely for that purpose would be in error. But the district court did not err in finding Dr. Naughton's testimony relevant for the limited purpose of establishing that early discovery of cancer leads to a better prognosis. And within the parameters of the district court's ruling, Dr. Naughton's testimony corroborated other evidence of negligent conduct.

We conclude that Appellees' cross-appeals lack merit. However, upon retrial, the district court shall rule on the parties' motions and objections with due consideration of our holding on the loss-of-chance doctrine.

## VI. CONCLUSION

For the aforementioned reasons, as to Mary's cause of action, we conclude that the district court erred in granting Appellees' motions for directed verdict and we reverse the matter for a new trial. However, we affirm the directed verdict granted as to Terry's cause of action. We further find no merit in Appellees' cross-appeals.

Affirmed in part, and in part reversed
and remanded for a new trial.

Funke, J., not participating.

---

[35] See *Union Ins. Co. v. Bailey*, 234 Neb. 257, 450 N.W.2d 661 (1990) (question of amount of damages to be awarded is solely one for fact finder).